Justice Sotomayor,
with whom
Justice Stevens and Justice Ginsburg join, dissenting.
In my view, the Carmack Amendment to the Interstate Commerce Act (ICA or Act), § 7, 34 Stat. 595, plainly applies to the inland leg of a multimodal shipment traveling on an international through bill of lading. Unless they have permissibly contracted around Carmack’s requirements, rail carriers in the United States such as petitioner Union Pacific are subject to those requirements, even though ocean carriers such as petitioner “K” Line are not. To avoid this simple conclusion, the Court contorts the statute and our cases, misreads the statutory history, and ascribes to Congress a series of policy choices that Congress manifestly did not make. Because I believe Carmack provides the default legal regime for rail transportation of cargo within the United States, regardless of whether the shipment originated abroad, I would reach the second question presented: whether Union Pacific was free to opt out of Carmack under 49 U. S. C. § 10709, or whether Union Pacific first had to offer “K” Line, its contractual counterparty, Carmack-compliant terms under § 10502. As to that question, I would hold that opt-out under § 10709 was not available and would remand to the District Court to consider in the first instance whether Union Pacific satisfied its obligations under §10502. For these reasons, I respectfully dissent.
I
The Court’s interpretation of Carmack’s scope is wrong as a matter of text, history, and policy.
*113 A
1
I begin with the statute’s text. Two provisions guide my conclusion that Carmack provides the default legal regime for the inland leg of a multimodal shipment traveling on an international through bill of lading: § 11706(a), which outlines the basic requirements for liability under Carmack, and § 10501(a), which defines the jurisdiction of the Surface Transportation Board (STB or Board), the successor to the Interstate Commerce Commission (ICC), see ante, at 97. Section 11706(a) states as follows:
“A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this subsection is for the actual loss or injury to the property caused by— “(1) the receiving rail carrier;
“(2) the delivering rail carrier; or
“(3) another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.
“Failure to issue a receipt or bill of lading does not affect the liability of a rail carrier. A delivering rail carrier is deemed to be the rail carrier performing the line-haul transportation nearest the destination but does not include a rail carrier providing only a switching service at the destination.”
*114 With respect to the Board’s jurisdiction, § 10501(a) provides as follows:
“(1) Subject to this chapter, the Board has jurisdiction over transportation by rail carrier that is—
“(A) only by railroad; or
“(B) by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.
“(2) Jurisdiction under paragraph (1) applies only to transportation in the United States between a place in—
“(A) a State and a place in the same or another State as part of the interstate rail network;
“(E) the United States and another place in the United States through a foreign country; or
“(F) the United States and a place in a foreign country.”
“A simple, straight-forward reading of [these provisions] practically compels the conclusion that the Carmack Amendment applies in a typical multimodal carriage case with inland damage.” Sturley, Maritime Cases About Train Wrecks: Applying Maritime Law to the Inland Damage of Ocean Cargo, 40 J. Maritime L. & Comm. 1,13 (2009) (hereinafter Train Wrecks). The first sentence of § 11706(a) sets forth the circumstances in which a receiving rail carrier must issue a bill of lading: when property is first “receive[d]” for domestic transportation. This sentence does not define the fall scope of Carmack liability, however, as the penultimate sentence of § 11706(a) makes the absence of a bill of lading ultimately immaterial to the question of Carmack liability. Instead, the second sentence of § 11706(a) establishes Car-mack’s expansive scope, explaining which carriers are subject to Carmack liability: not only the rail carrier that receives the property, but also “any other carrier that delivers the property and is providing transportation or service sub~ *115 ject to the jurisdiction of the Board under this part.” Critically, that a rail carrier’s provision of “transportation or service subject to the jurisdiction of the Board” is the criterion that establishes liability under Carmack demonstrates that Carmack’s scope must bé considered in tandem with the provision describing the Board’s jurisdiction over rail carriage.
Under that provision, the Board has authority “over transportation by rail carrier,” either when that transportation is “only by railroad” or when it is “by railroad and water, when the transportation is under common control, management, or arrangement for a continuous carriage or shipment.” § 10501(a)(1). Board jurisdiction over transportation by rail carrier “applies only to transportation in the United States,” not to transportation abroad. § 10501(a)(2). Within the United States, however, Board jurisdiction exists broadly whenever that transportation is “between,” inter alia, “a place in ... a State and a place in the same or another State as part of the interstate rail network,” “a place in . . . the United States and another place in the United States through a foreign country,” or “a place in . . . the United States and a place in a foreign country.” §§ 10501(a)(2)(A), (E), (F).
With the jurisdictional framework in mind, I return to the final sentences of Carmack, §11706. The third sentence clarifies that liability under Carmack is imposed upon (1) “the receiving rail carrier” (which, under the first sentence of § 11706(a) and the definition of the Board’s jurisdiction over domestic rail carriage in § 10501(a), is the rail carrier that first receives the property for transportation in the United States); (2) “the delivering rail carrier” (which, under the last sentence of § 11706(a) and the Board’s jurisdiction over domestic rail carriage in § 10501(a), is the final rail carrier providing the long-distance transportation “nearest the destination” in the United States); and (3) “another rail carrier over whose line or route the property is transported in *116 the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.” § 11706(a). This last phrase in § 11706(a)(3) serves two functions. It ensures that, where the entire rail transportation is “[withjin the United States,” any connecting rail carrier between the point at which the goods were received and the point at which the goods were delivered is liable under Carmack. It also ensures that, where the final destination of the goods is in Canada or Mexico, such that there is no domestic “delivering” carrier, a connecting carrier taking on the goods in the United States will remain subject to Carmack as it travels toward its foreign destination while still in the United States. (As noted, the jurisdictional provision, incorporated by reference in § 11706(a), is limited to “transportation in the United States,” § 10501(a)(2).)
The language of Carmack thus announces an expansive intent to provide the liability regime for rail carriage of property within the United States. Once a first domestic rail carrier subject to the Board’s jurisdiction receives property in the United States, Carmack attaches, regardless of where the property originated. Carmack then applies to any other rail carrier subject to the Board’s jurisdiction in the chain of transportation, no matter whether the ultimate destination of the property is in the United States or elsewhere, for the period the carrier is traveling within the United States.
It seems to me plain that, under these broadly inclusive provisions, Carmack governs rail carriers such as Union Pacific for any transportation of cargo within the United States, whether or not their domestic transportation is part of a multimodal international shipment, and whether or not they actually issued a domestic bill of lading. There is no question that Union Pacific is a “rail carrier” that is “subject to the jurisdiction of the Board.” § 11706(a). It “receive[dj” the cargo, ibid., in California for domestic transportation to four different domestic inland locations — i. e., “between a *117 place in ... a State and a place in . . . another State,” § 10501(a)(2)(A) — while the shipment itself was transported “between a place in . . . the United States and a place in a foreign country,” § 10501(a)(2)(F). Union Pacific should have issued a bill of lading for the cargo it received, but its failure to do so does not shield it from liability, as.§ 11706(a) makes clear. Carmack therefore provides the legal regime governing Union Pacific’s rail transportation in these cases.
Carmack does not, however, govern ocean carriers such as “K” Line, because such carriers are not “rail carrier[s] providing transportation or service subject to the jurisdiction of the Board.” § 11706(a). The ICA defines a “rail carrier” as “a person providing common carrier railroad transportation for compensation.” §.10102(5). To resolve whether “K” Line meets this definition, I would apply the STB’s well-established test and ask whether it “conduct[s] rail operations” and “‘hold[s] out’ that service to the public.” Association of P&C Dock Longshoremen v. Pittsburgh & Conneaut Dock Co., 8 I. C. C. 2d 280, 290 (1992).
Respondents — the owners of cargo that was allegedly damaged during Union Pacific’s train derailment in Oklahoma, ante, at 93-95 — primarily contend that “K” Line conducted rail operations by using containers to transport the cargo from China to the United States in conjunction with Union Pacific’s subsequent carriage of those same containers. Brief for Respondents 82-83 (noting that the statutory definition of “railroad” includes “ 'intermodal equipment used [by or] in connection with a railroad,’ ” § 10102(6)(A)). This interpretation goes too far. Read so literally, the statute would render a truck a railroad simply because the truck transported containers during a journey in which the containers also traveled by rail. Such a reading would gut the separate provisions of the ICÁ governing motor carriage in Subtitle IV, Part B, of Title 49. The ICA’s broad description of what the term “railroad” “includes,” § 10102(6), is better read as ensuring that all services a rail carrier conducts are *118 regulated under the Act “to prevent overcharges and discriminations from being made under the pretext of performing such additional services.” Cleveland, C., C. & St L. R. Co. v. Dettlebach, 239 U. S. 588, 594 (1916).
At oral argument, respondents focused on a separate argument, contending that “K” Line should be considered a rail carrier because it conducts substantial rail operations at its depot facility in Long Beach, California. Tr. of Oral Arg. 37 (describing transportation between Port of Los Angeles, where “K” Line’s private chassis transport the containers on the port’s train tracks to the Los Angeles train depot, where the containers are loaded onto Union Pacific trains for inland transportation). I agree with the Board, however, that “‘ownership and operation of private terminal facilities, including rail yards,’” is not sufficient to bring a shipper within the definition of “ ‘a rail carrier subject to [Board] jurisdiction’” where the “‘terminal is maintained for [the ocean common carrier’s] exclusive use in interchanging cargo with rail and motor carriers providing inland transportation.’” Joint Application of CSX Corp. & Sea-Land Corp. Under 49 U. S. C. §11821, 3 I. C. C. 2d 512, 519 (1987).[1]
The jurisdictional provisions of the ICA and the Shipping Act of 1984, 46 U. S. C. §40101 et seq., confirm my view that “K” Line is not a rail carrier “subject to the jurisdiction of the Board,” 49 U. S. C. § 11706(a), under Carmack. The STB’s jurisdiction over transportation by rail carriers is “exclusive,” § 10501(b), while ocean carriers are subject to the jurisdiction of the Federal Maritime Commission (FMC), 46 U. S. C. § 40102; see also 46 CFR § 520.1 (2009). In addition, the Board’s jurisdiction over water carriage is limited to domestic water carriage. 49 U. S. C. § 13521(a)(3). The Board itself has concluded that ocean carriers providing intermodal *119 transportation jointly with inland rail and motor carriers are subject to the FMC’s jurisdiction rather than its own. See Improvement of TOFC/COFC Regulations, 3 I. C. C. 2d 869, 883 (1987).
For these reasons, Carmack governs Union Pacific but not “K” Line for the inland transportation at issue in these cases.
2
In finding Carmack inapplicable to the inland transportation in these cases, the majority relies on the fact that Car-mack does not govern ocean carriers such as “K” Line. While I agree that “K” Line is not a rail carrier, the majority places too much weight on that determination. That the ocean carrier “K” Line is not subject to Carmack does not affect the determination that the rail carrier Union Pacific is, for the textual reasons I have explained. The majority’s contrary reading of the statute reflects four fundamental errors.
First, the majority reads the term “receiving rail carrier” in § 11706(a) too narrowly. There is simply no basis in the text of the statute to support the majority’s conclusion that Carmack applies only when the first rail carrier in the chain of transportation accepted the cargo at the shipment’s point of origin. Cf. ante, at 101,103. The two cases the majority cites for this proposition are inapposite, as neither addresses an international, multimodal shipment in which the first leg of the trip was by ocean.[2] In St. Louis, I. M. & S. R. Co. v. Starbird, 243 U. S. 592, 594 (1917), the entire shipment was by rail from Arkansas to New York City. And in Mexican Light & Power Co. v. Texas Mexican R. Co., 331 U. S. 731, 732 (1947), the entire shipment was by rail from Pennsylvania to Mexico. Given that the first rail carrier was in each case the carrier that received the goods from the shipper and *120 issued a through bill of lading, it is unsurprising that the Court, applying Carmack, described that carrier as the “initial carrier.” 248 U. S., at 595; 331 U. S., at 733. But nothing in these cases, and nothing in Carmack itself, requires that the “receiving carrier” take the goods from the shipper at the shipment’s point of origin.[3]
Instead, these cases are compatible with my view that the “receiving carrier” is any rail carrier that first receives cargo for transportation in the United States. Union Pacific, which is unquestionably a “rail carrier” in the normal sense of those words, is also the “receiving carrier” subject to liability under Carmack.[4] Our opinion in Reider v. Thompson, 339 U. S. 113 (1950), further supports this reading. There we explained that the test for Carmack applicability “is not where the shipment originated, but where the obligation of the carrier as receiving carrier originated.” Id., at 117. Because Carmack applies to domestic rail transport, and the domestic rail carrier’s obligation in that case arose in New Orleans where the rail carrier received the goods, it did not matter that the shipment began overseas in Buenos Aires. Similarly, in the instant cases, because Union Pacific’s obligations to transport by rail originated in California, it does not matter that the shipment began overseas in China.[5]
*121 Second, the majority errs in suggesting that the issuance of an international through bill of lading precludes the applicability of Carmack. Cf. ante, at 101-102, 104-105. The eases on which the majority relies do not stand for this proposition. In Reider, the Court found Carmack applicable when the first domestic rail carrier issued a bill of lading from New Orleans to Boston. Although we observed in that opinion that there was no through bill of lading from Buenos Aires to Boston, 839 U. S., at 117, we did not say, and it is not a necessary corollary, that the presence of such a bill of lading would have commanded a different result. The observation is better read as indicating that no law other than Carmack could possibly have applied in that case: Because “the shipment... could not have moved an inch beyond New Orleans under the ocean bill,” id., at 118, a new domestic bill of lading for domestic transportation was required, and as to that transportation, we held, Carmack unquestionably applied.
For its part, Mexican Light held only that, where the first rail carrier in the chain of transportation issued a bill of lading, a subsequent bill of lading issued by a later rail carrier was void because Carmack contemplates one through bill of lading governing the entire journey by rail. 331 U. S., at 734. A subsequent bill of lading by a connecting rail carrier, however, can be void under Carmack without requiring the conclusion that an international through bill of lading involv *122 ing initial transportation by ocean carrier would void a subsequent bill of lading issued in the United States by the first rail carrier in the domestic chain of transportation. Because the text of Carmack expressly requires a bill of lading to be issued for property “reeeive[d] for transportation under this part,” and Union Pacific first received the property for rail transportation in the United States, it should have issued a bill of lading. Of course, its failure to do so did not affect its liability under Carmack (or that of a subsequent connecting or delivering carrier), as § 11706(a) explicitly states.
Third, the majority errs in giving weight to the difference in scope between Carmack liability and the jurisdiction of the Board. Ante, at 105. I agree with the majority that Carmack’s reach is narrower than the Board’s jurisdiction. The Board’s jurisdiction extends over transportation by rail carrier “in the United States between a place in . . . the United States and a place in a foreign country,” § 10501(a)(2)(F), which indicates that it does not matter whether the movement of the transportation is from the United States to the foreign country or from the foreign country to the United States.[6] In contrast, Carmack applies only when a rail carrier first receives property in the United States, § 11706(a), and therefore would not apply to a rail carrier originating in Canada and delivering in the United *123 States without transferring the property to a domestic rail carrier.[7] As long as there is a receiving rail carrier in the United States, however, Carmack attaches. Because the property at issue in these cases was received in the United States for domestic transportation by Union Pacific, Carmack governs the rail carrier’s liability.
Finally, the majority misunderstands the role I believe Carmack liability plays in international shipments to the United States. My reading of the statute would not “outlaw through shipments under a single bill of láding.” Ante, at 104. To the contrary, an overseas ocean chrrier like “K” Line can still issue a through bill of lading governing the entire international trip to an American destination. That bill of lading reflects the ocean carrier’s agreement with and obligations to the original shipper of the cargo. As the ocean carrier has no independent Carmack obligations of its own, the ocean carrier and the shipper are free to select whatever liability terms they wish to govern their relationship during the entire shipment. See infra, at 131. Carmack simply requires an American “receiving rail carrier” like Union Pacific to issue a bill of lading to the party from whom it received the goods for shipment — here, “K” Line. See Norfolk Southern R. Co. v. James N. Kirby, Pty Ltd., 543 U. S. 14, 33 (2004) (“When an intermediary contracts with a carrier to transport goods, the cargo owner’s recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed”); Great Northern R. Co. v. O’Connor, 232 U. S. 508, 514-515 (1914) (holding that a railroad company is entitled to treat the intermediary forwarder as the shipper). As to that bill of lading, Car-mack provides the legal regime and defines the relationship between the contracting parties (unless they have agreed to contract out of Carmack, see infra, at 134-137). The issuance of this second bill of lading, however, in no way under *124 mines the efficiency of the through bill of lading between the ocean carrier and the original shipper, nor does it require that those parties bind themselves to apply Carmack to the inland leg.[8]
B
In addition to misreading the text, the Court’s opinion misapplies Carmack’s statutory history. The Court states that no version of Carmack has ever applied to imports originating overseas on a through bill of lading. Ante, at 107. The Court further asserts that, because Congress stated that the 1978 recodification of the ICA effected no “substantive change,” Carmack should be read consistently with this historical practice. Ante, at 108. There are three problems with this analysis.
First, if “Congress intended no substantive change” to Carmack in the 1978 recodification, “that would mean only that the present text is the best evidence of what the law *125 has always meant, and that the language of the prior version cannot be relied upon to support a different reading.” Keene Corp. v. United States, 508 U. S. 200, 221 (1993) (Stevens, J., dissenting). Because the present text of Carmack indicates that it applies to the domestic inland rail transportation of a multimodal international shipment, there is no reason to rely on Congress' statement in the recodiftcation.
Second, there is no necessary conflict between the pre-1978 version of Carmack and my reading of the current text. The pre-1978 text referred to a carrier “receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, [or the] District of Columbia, or from any point in the United States to a point in an adjacent foreign country.” 49 U. S. C. § 20(11) (1976 ed.).[9] A rail carrier, like Union Pacific, that receives property in California for transportation to locations in the American Midwest “receives] property from a point in one State ... to a point in another State,” regardless of whether the property originated in California or China. The geographical restriction “from any point in the United States to a point in an adjacent foreign country” simply reflected agreements between the ICC and its Canadian counterpart to respect each other's regulation of rail carriage originating in that country. See Brief for United States as Amicus Curiae 17-18 (hereinafter Brief for United States). It does not indicate any rejection of Carmack's applicability to imports as a whole or exports to a nonadjacent foreign country.[10] Instead, the “adjacent foreign country” provision *126 was expansive rather than limiting, ensuring that Carmack would apply where a shipment traveled by rail from New York City through to Montreal without stopping at the border of Canada.
Third, to the extent there are meaningful differences between the pre-1978 text of Carmack and its current text, it is the current text that we should interpret, regardless of Congress’ general hortatory statement in the 1978 Public Law applicable to the entire ICA. As we have often observed, “[a] specific provision controls one of more general application.” Gozlon-Peretz v. United States, 498 U. S. 395, 407 (1991). The general statement that Congress intended no change to the ICA should not require us to ignore what the current text of the specific Carmack provision says, as both Union Pacific and “K” Line explicitly ask us to do. See Brief for Petitioner in No. 08-1554, p. 20 (“The Pre-1978 Statutory Language Controls This Case”); Brief for Petitioners in No. 08-1553, pp. 41-49 (arguing for reliance on pre1978 text). Petitioners’ view of statutory interpretation *127 would give rise to an unwieldy — and unjust — system. I would have thought it beyond cavil that litigants are entitled to rely on the currently applicable version of enacted statutes to determine their rights and obligations.
In the final analysis, the meaning of the pre-1978 language is murky, and Congress’ instruction that the 1978 recodification effected no substantive change provides no meaningful guidance. The current text does not restrict Carmack’s coverage to trade with adjacent foreign countries, and it makes no distinction between imports and exports. Carmack’s ambiguous history cannot justify reading such atextual limitations into the statute.[11]
*128 c
The Court’s suggestion that its interpretation properly effectuates the goals of Carmack and “attains the most consistency between Carmack and [the Carriage of Goods by Sea Act (COGSA)],” ante, at 108, reflects its fundamental misunderstanding of these statutes and the broader legal context in which the international shipping industry functions. As the mandatory default regime governing the relationship between an American receiving rail carrier and its direct contracting partner (here an overseas ocean carrier), Car-mack permits the shippers who contract for a through bill of lading with the ocean carrier to receive the benefit of Car-mack through that once-removed relationship. Such a legal regime is entirely consistent with COGSA and industry practice.
As noted, the Court’s position as to Carmack rests on its erroneous belief that the “receiving carrier” must receive the goods at the point of the shipment’s origin. Ante, at 103-106. Because Carmack provides that suit against the receiving rail carrier “may only be brought... in the judicial district in which the point of origin is located,” 49 U. S. C. § 11706(d)(2)(A)(i), and defines “judicial district” as only a federal or state court, § 11706(d)(2)(B), the Court mistakenly concludes that were Carmack to apply to inland transportation of international shipments, “there would often be no venue in which to sue the receiving carrier” because that carrier would have received the goods in a foreign country where no federal or state court exists, ante, at 105-106,108. Contrary to the Court’s suggestion, however, the proper venue in which to sue a receiving carrier under Carmack is the location in which the first domestic rail carrier received the goods for domestic transportation. Supra, at 115-116, 120.
Nor is it true that Carmack’s focus is on providing a single through bill of lading for an entire shipment. Ante, at 108. Carmack’s purpose in § 11706 is to ensure that a single bill *129 of lading, with a single protective liability regime, governs an entire shipment by rail carrier within the United States.[12] It does not require the rail carrier to offer Carmackcompliant terms to anyone but the party with whom the rail carrier contracts when it receives the goods. It does not place obligations on the relationship between any overseas carrier and any overseas shipper that operate under their own bill of lading. That Congress expected different liability regimes to govern ocean and rail carriers can be inferred from the different regulatory oversight provided for each type of carrier — the FMC for the former, the STB for the latter, see supra, at 118-119.
Moreover, that Carmack provides certain greater protections than does COGSA demonstrates that one of Carmack’s purposes — beyond simply the fact of a single bill of lading governing all rail transportation — was to specify a protective liability regime for that part of the shipment only. As compared to COGSA, Carmack provides heightened liability rules for rail transportation, compare COGSA §4, 49 Stat. 1209, note following 46 U. S. C. § 30701, p. 1179, with 49 U. S. C. §§ 11706(a)-(c); stricter venue requirements, compare Vimar Seguros y Reaseguros, S. A. v. M/V Sky Reefer, 515 U. S. 528, 535 (1995), with § 11706(d); and more generous time allowances for filing suit, compare COGSA §3(6), at 1179, with § 11706(e). Congress is evidently wary of creating broad exemptions from Carmack’s regime: While Congress has given expansive authority to the STB to deregulate carriers from the requirements of the ICA, it has precluded the STB from excusing carriers from complying with Carmack. See infra, at 136 (discussing § 10502). By taking Carmack’s protections out of the picture for goods that travel by rail in the United States whenever the goods first traveled by ocean liner, it is the Court that “undermine[s] Carmack’s pur *130 poses,” ante, at 108. Cf. Reider, 339 U. S., at 119 (applying Carmack to domestic rail transportation of goods, even where the goods originated overseas, in order to avoid “immunizing] from the beneficial provisions of the [Carmack] Amendment all shipments originating in a foreign country when reshipped via the very transportation chain with which the Amendment was most concerned”).
The Court’s suggestion that its interpretation best comports with the goals of COGSA fares no better. The Court is correct, ante, at 99, that Congress has permitted parties contractually to extend COGSA, which, by its own terms, applies only to the period “from the time when the goods are loaded on to the time when they are discharged from the ship.” §§ 1(e), 7, at 1178,1180. But the Court ignores that COGSA specifically contemplates that there may be “other law” that mandatorily governs the inland leg, and makes clear that contractual extension of COGSA does not trump this law. § 12, at 1180 (“Nothing in [COGSA] shall be construed as superseding . . . any other law which would be applicable in the absence of [COGSA], insofar as they relate to the duties, responsibilities, and liabilities of the ship or carrier prior to the time when the goods are loaded on or after the time they are discharged from the ship”); see also Sturley, Freedom of Contract and the Ironic Story of Section 7 of the Carriage of Goods by Sea Act, 4 Benedict’s Maritime Bull. 201, 202 (2006) (“It is highly ironic to suggest that section 7 was intended to facilitate the extension of COGSA [inland]. The unambiguous history demonstrates that section 7 was specifically designed to accomplish exactly the opposite result”). Notably, when it wants to do so, Congress knows how to specify that a contractual extension of COGSA supersedes other law: COGSA elsewhere defines a limited circumstance — the carriage of goods by sea between ports of the United States — in which a contractual extension of COGSA has the force of law. § 13, at 1180 (providing that *131 such bills of lading “shall be subjected hereto as fully as if subject hereto by the express provisions of [COGSA]”). That Congress did not make the same provision for inland travel is powerful evidence that it meant for Carmack to remain the default regime on land governing the relationship between an inland rail carrier and an overseas carrier with which it directly contracted.
The Court is also wrong that its interpretation avoids the risk that two sets of rules will apply to the same shipment at different times.[13] Ante, at 108-109. Even under the Court’s interpretation, two sets of rules may govern, because the parties need not extend COGSA to the inland leg — they may agree on any terms they choose to cover that transportation. § 7, at 1180 (permitting the parties to “ente[r] into any agreement ... as to the responsibility and liability of the carrier or the ship” for the period before the goods are loaded on and after they are discharged from the ship (emphasis added)); see also Train Wrecks 23 (“[C]arriers regularly include clauses in their bills of lading to limit their liability [for inland travel] in ways that COGSA prohibits”); 1 T. Schoenbaum, Admiralty and Maritime Law §10-4, pp. 599-600 (4th ed. 2004) (describing typical non-COGSA liability rules parties select for the inland leg). In these cases, for example, “K” Line’s bills of lading include certain terms governing the inland leg that differ from the terms governing the ocean carriage. See, e. g., App. 147 (providing different timeframes within which suit must be brought depending on whether the actionable conduct “occurred during other than Water Carriage”).
The Court relies heavily on Kirby as identifying the relevant policy consideration in these cases, but it takes the *132 wrong lesson from Kirby. In that case, we were concerned about displacing a single federal law, COGSA, with 50 varying state liability regimes.[14] 543 U. S., at 28-29. The rule the Court establishes today creates even greater practical difficulties than the regime we criticized in Kirby by displacing Carmack with as many liability rules as there are bills of lading. It would even permit different liability rules to apply to different lawsuits arising out of the same inland accident depending on where each piece of cargo originated. Contrary to the Court’s view, then, the value of uniformity articulated in Kirby is best promoted by application of Car-mack to the obligations of the rail carrier during the inland leg in these cases. Cf. ante, at 99-100, 108-109.
Finally, while purporting to effectuate the contractual choices of the parties in the international multimodal shipping industry, ante, at 108-111, the Court ignores the realities of the industry’s operation. The industry has long been accustomed to drafting bills of lading that encompass two legal regimes, one governing ocean transportation and another governing inland transportation, given mandatory law governing road and rail carriage in most of Europe and in certain countries in Asia and North Africa. See generally Convention on the Contract for the International Carriage of Goods by Road, May 19,1956, 399 U. N. T. S. 189; Uniform Rules Concerning the Contract for International Carriage of Goods by Rail, App. B to the Convention Concerning International Carriage by Rail, May 9, 1980, 1397 U. N. T. S. 112, as amended by Protocol for the Modification of the Convention Concerning International Carriage of Rail of May 9, 1980, June 3, 1999. Indeed, “K” Line’s own bills of lading *133 evidence this practice, providing that, where an “applicable international convention or national law” exists, “cannot be departed from,” and “would have, applied” if a separate contract for inland carriage had been made between the merchant and the inland carrier, those laws govern “K” Line’s liability. Brief for Respondents' 53.
The recently signed United Nations Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea, also known as the “Rotterdam Rules,” provided an opportunity for the international community to adopt rules for multimodal shipments that would be uniform for both the ocean and inland legs. See generally Train Wrecks 36-39. Instead, the final version of the Rotterdam Rules retained the current system in which the inland leg may be governed by a different legal regime than the ocean leg. See United Nations Convention on Contracts for the International Carriage of Goods Wholly or Partly by Sea, G. A. Res. 63/122, art. 26, A/RES/63/122 (Dec. 11, 2008). The Association of American Railroads and the United States, among others, advocated for this outcome.[15] See Proposal of the United States of America on the Definition of “Maritime Performing Party,” U. N. Doc. A/CN.9/WG.III/ WP.84, ¶¶ 1-2 (Feb. 28, 2007); Proposal by the United States of America, U. N. Doc. A/CN.9/WG.III/WP.34, ¶7 (Aug. 7, 2003); Proposals by the International Road Transport Union (IRU), U. N. Doc. A/CN.9/WG.III/WP.90, ¶ 1 (Mar. 27, 2007); Preparation of a Draft Instrument on the Carriage of Goods [by Sea], Compilation of Replies to a Questionnaire on Door-to-Door Transport, U. N. Doc. A/CN.9/WG.III/WP.28, pp. 32-34, 43 (Jan'. 31, 2003) (comments on behalf of the Association of American Railroads and the IRU). Thus, the Court’s mistaken interpretation not only upsets domestic law but also *134 disregards industry practice as- evidenced by carefully calibrated international negotiations.[16]
II
Because, in my view, Carmack provides the default legal regime governing the relationship between the rail carrier and the ocean carrier during the inland leg of a multimodal shipment traveling on a through bill of lading, I would reach the second question presented by these cases: whether the parties validly contracted out .of Carmack. I would hold that where, as here, the STB has exempted rail carriers from Part A of the ICA pursuant to its authority as set forth in 49 U. S. C. § 10502, such rail carriers may not use § 10709 to opt out of Carmack entirely. Instead, such rail carriers must first offer their contractual counterparties Carmackcompliant terms for liability and claims, as § 10502(e) requires. Having reached that conclusion, I would remand for consideration of whether the requirements of § 10502(e) were met in these cases. I set forth these views only briefly, as the Court’s determination that Carmack does not apply at all makes resolution of these questions moot.
A
In the Staggers Rail Act of 1980, Pub. L. 96-448, 94 Stat. 1895, Congress set forth a national policy of “allow[ing], to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail” and “minimiz[ing] the need for Federal regulatory *135 control” of the railroad industry. § 101, id., at 1897. Consistent with these goals, 49 U. S. C. §§ 10502 and 10709 provide two options for contracting around the requirements of the ICA.
Section 10502(a) provides that when certain conditions are met, the Board “shall exempt,” “to the maximum extent consistent with this part,” “a person, class of persons, or a transaction or service” from either a particular provision of Part A of the ICA or the entirety of that Part. Section 10502(f) specifies that “[t]he Board may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.” Acting pursuant to this authority, the Board has broadly exempted such transportation “from the requirements of [the ICA].”' 49 CFR § 1090.2 (2009). The authority to issue broad exemptions, however, is not unlimited. Under 49 U. S. C. § 10502(e), “[n]o exemption order issued pursuant to this section shall operate to relieve any rail carrier from an obligation to provide contractual terms for liability and claims which are consistent with the provisions of [Car-mack],” although, at the same time, “[n]othing . .. shall prevent rail carriers from offering alternative terms.” Section 10502(g) further limits the Board from exempting rail carriers from their obligations to comply with certain employee protections under Part A of the ICA.
In turn, under § 10709(a), “[o]ne or more rail carriers providing transportation subject to the jurisdiction of the Board . . . may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.” Having signed such a contract, a rail carrier “shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract.” § 10709(b). Once such a contract is made, that contract, “and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on *136 the grounds that such contract violates a provision of [Part A of the ICA].” § 10709(c)(1).
According to Union Pacific, § 10502(e) limits only the Board’s exemption ability; it does not place any affirmative obligation on rail carriers to offer Carmack-compliant terms. Rail carriers, Union Pacific contends, may opt out of Car-mack entirely simply by entering into a contract under § 10709, thus escaping any duty imposed by Part A of the ICA. I disagree. I am persuaded by the Government’s view that because the Board’s order in 49 CFR' § 1090.2 exempted intermodal rail transportation from all of Part A of the ICA, which includes 49 U. S. C. § 10709, “Union Pacific could not properly enter into a contract under Section 10709 to relieve it of its obligations under Section 10502(e).” Brief for United States 31. Those obligations require “a rail carrier providing exempt transportation [to] offer the shipper the option of contractual terms for liability and claims consistent with Carmack, presumably at a higher rate,” and they permit such a rail carrier to “enter into a contract with different terms only if the shipper does not select that option.” Id., at 30.
Observing that the Board’s exemption order relieves inter-modal rail transportation from the “requirements”.of Part A, Union Pacific contends that § 10709 is not a requirement but a privilege and therefore is not included within the exemption. In clarifying its order, however, the Board has described the exemption as one from “regulation” under the ICA or “application” of that Act. See, e. g., Improvement of TOFC/COFC Regulations, 3 I. C. C. 2d, at 869-870. Especially in light of this clarification, there seems little reason to ascribe significance to the Board’s use of the word “requirements,” instead of the statutory term “provision,” in the exemption order.
The Government aptly describes the policy concerns that justify this reading of the interplay between §§10502 and 10709. Brief for United States 31-32. Because a rail carri *137 er’s counterparty to a § 10709 contract can ordinarily require a rail carrier to comply with common carriage rates and terms under Part A (including Carmack), such counterparties possess considerable bargaining power. But rail carriers the Board has exempted from Part A under § 10502 lack any obligation to comply with that Part. If exempt carriers could escape Carmack’s obligations under § 10709, their counterparties would be at a significant disadvantage as compared to counterparties to contracts with nonexempt carriers. Such a disadvantage cannot be squared with Congress’ evident intent, as expressed in § 10502(e), to ensure that no carrier may be automatically exempted from Carmack.
This interpretation of §§ 10502 and 10709 imposes no unfairness on exempt rail carriers. As the Court of Appeals explained, “carriers providing exempt transportation gain the benefits of deregulation, but lose the opportunity to contract for preferable terms under § 10709 without first offering Carmack terms.” 557 F. 3d 985, 1002 (CA9 2009). Given rail carriers’ ability to charge higher rates for full Carmack coverage, see New York, N. H. & H. R. Co. v. Nothnagle, 346 U. S. 128, 135 (1953), and the likelihood that some counterparties will agree to reject Carmack-compliant terms in favor of a lowet price, such a tradeoff makes eminent sense.
B
Whether Union Pacific properly contracted out of Carmack under § 10502(e) requires a factual determination better suited for resolution by the District Court in the first instance. Accordingly, I would remand for consideration of that issue. Cf. 557 F. 3d, at 1003. Union Pacific also raises a related legal argument not decided by the courts below: that the forum selection clause at issue in these cases is valid because venue is not encompassed within the phrase “contractual terms for liability and claims” in § 10502(e). To the extent this argument is not waived, it would also be properly considered on remand.
*138 * * *
In endorsing a strained reading of the text, history, and purpose of Carmack, the Court is evidently concerned with a perceived need to enforce the 'COGSA-based contracts that the “sophisticated cargo owners” here made with “K” Line. Ante, at 109. But these cases do not require the Court to interpret or examine the contract between the cargo owners and “K” Line. The Court need consider only the legal relationship between Union Pacific and “K” Line as its direct contracting party. As to that relationship, it bears emphasizing that industry actors on all sides are sophisticated and can easily adapt to a regime in which Carmack provides the default rule governing the rail carrier’s liability during the inland leg of a multimodal shipment traveling on an international through bill of lading. See, e. g., Train Wrecks 40 (describing how ocean and rail carriers have drafted their contracts to account for — and permissibly escape — Carmack’s applicability); cf. Kirby, 543 U. S., at 36 (recognizing that “our decision does no more than provide a legal backdrop against which future bills of lading will be negotiated”). In disregarding Congress’ commands in both Carmack and COGSA and in discounting the practical realities reflected in the Rotterdam Rules and other international conventions governing the carriage of goods, the, Court ignores what we acknowledged in Kirby: “It is not. . . this Court’s task to structure the international shipping industry.” Ibid. I respectfully dissent.

 Because I do not think that “K” Line conducts rail operations at all, I would not reach the question whether “K” Line holds itself out as offering rail common carriage. Compare Brief for Respondents 84-85 with Reply Brief for Petitioners in No. 08-1553, pp. 7-10.

 The additional cases the United States cites for this proposition suffer from this same flaw. See Brief for United States as Amicus Curiae 27-28; Tr. of Oral Arg. 20.

 Carmack’s venue provision refers to the “receiving rail carrier” as the “originating rail carrier” and states that the proper venue for a lawsuit against this carrier is “the judicial district in which the point of origin is located.” § 11706(d)(2)(A)®. Especially because the focus of Carmack is on transportation by rail, the phrase “point of origin” in this context is best read as referring to the point of origin of the “originating rail Garrieras]” transportation, not the point of origin of the shipment.

 The majority suggests that respondents “conceded” at oral argument that Union Pacific was not a receiving carrier but only a delivering carrier. Ante, at 104. Of course, this Court is not bound by a party’s concession in our interpretation of a statute. See, e.g., Massachusetts v. United States, 333 U. S. 611, 624-625 (1948).

 Contrary to Union Pacific’s suggestion, Brief for Petitioner in No. OS-1554, p. 33, its obligations did not originate in China. “K” Line’s bills of lading, issued in China, “entitled [“K” Line] to sub-contract on any *121 terms ... all duties whatsoever undertaken,” App. 145, and therefore did not create any obligation on the part of Union Pacific in China. In turn, the agreement between “K” Line and Union Pacific — which “K” Line made “by and through its duly authorized agent and representative in the United States, ‘K’ Line AMERICA, INC. ... , a Michigan corporation,” id., at 120 — was a multiyear contract committing “K” Line to “tender to [Union Pacific] not less than 95% of its Container traffic,” ibid,., but did not actually commit “K” Line to deliver any particular piece of cargo to Union Pacific. As “K” Line explains, then, “the Agreement [with Union Pacific] was a ‘requirements’ contract, which did not become effective as to any particular container until ‘K’ Line delivered it” to Union Pacific in California. Brief for Petitioners in No. 08-1553, p. 12.

 The ICA’s jurisdictional provision uses the term “foreign country” to describe the Board’s jurisdiction, § 10501(a)(2)(F), while Carmack uses the term “adjacent foreign country” to describe the liability of connecting carriers, § 11706(a)(3). I find the difference between these terms to be of no moment. Section 10501 describes the Board’s jurisdiction over rail carriers, and it is impossible to have connecting rail lines between the United States and a foreign country that is not adjacent. This reading is confirmed by § 10501(a)(2)(E), which refers to the Board’s jurisdiction over transportation by railroad “in the United States between a place in . . . the United States and another place in the United States and a foreign country.” No rail transportation between two places in the United States that is interrupted by rail transportation through a foreign country could be through a foreign country that is anything but adjacent.

 This situation is consistent with historical agreements between the ICC and its Canadian counterpart. See infra, at 125-126.

 The majority seems to find it troubling that my view “would require two bills of lading.” Ante, at 104. But international shipments frequently contain more than one bill of lading. See, e. g., Kirby, 543 U. S., at 30-33 (interpreting the parties’ obligations under two bills of lading, one between a shipper and a freight forwarding company to which the shipper originally delivered its goods, and one between the freight forwarding company and the ocean carrier to which the freight forwarder delivered the shipper’s goods). The majority also suggests that an original shipper might not be able to sue Union Pácifie under the terms of Union Pacific’s bill with “K” Line. Ante, at 104-105. In Kirby, however, we took as a given that the shipper could sue the inland rail carrier, even though the shipper was not a party to the rail carrier’s bill of lading with an intermediary. Indeed, we held that in an action against the rail carrier, the shipper was bound to the terms of the bill of lading governing the rail carrier’s transportation, even though those terms were less generous than the terms in the shipper’s through bill of lading with the freight forwarder with which it originally contracted. 543 U. S., at 33-34. We observed that the shipper could sue the freight forwarder to recover the difference. Id., at 35. In light of this analysis, I see no reason to doubt a shipper’s ability to sue an American rail carrier under Carmack, even though its bill of lading with an overseas ocean carrier is not governed by Carmack.

 The pre-1978 version of Carmack referred generally to a “carrier,” rather than a “rail carrier.” It was not until 1995 that Congress distinguished between Carmack’s applicability to rail carriers, §11706, and motor carriers, freight forwarders, and domestic water carriers, § 14706. Pub. L. 104-88, § 102(a), 109 Stat. 804, 847-849, 907-910.

 The Court ignores a further reason to believe that prior to 1978, Car-mack could be understood to apply to imports as well as exports. Even assuming (contrary to my view) that the relevant language in Carmack governing any international commercial exchange was the phrase “from *126 any point in the United States to a point in an adjacent foreign country,” the seemingly unidirectional “from . . . to” could reasonably have been interpreted as also encompassing “to ... from” in light of our decision in Galveston, H. & S. A. R. Co. v. Woodbury, 254 U. S. 357 (1920). In that case, this Court interpreted similar “from . . . to” language in the jurisdictional section of the ICA as conferring jurisdiction on the ICC over all transportation between such countries. Id., at 359-360 (construing “ ‘transportation . . . from any place in the United States to an adjacent foreign country’ ” in former 49 U. S. C. § 1 to include “transportation . . . from that country to the United States”). Given the “presumption that a given term is used to mean the same thing throughout a statute,” Brown v. Gardner, 513 U. S. 115, 118 (1994) (citing Atlantic Cleaners & Dyers, Inc. v. United States, 286 U. S. 427 (1932)), our construction of “from . . . to” in the ICA’s jurisdictional provision could reasonably have been read to sweep imports within the scope of Carmack. I would not, however, read “from ... to” in the current version of § 11706(a)(3) to encompass “to . . . from,” as Congress specifically amended the similar language in the jurisdictional provision at § 10501(a)(2) to “between” while leaving intact the “to .. . from” in Carmack, against the background of Woodbury.

 The United States, as amicus in support of “K” Line and Union Pacific, makes an effort to find such limitations in the current statutory text. See Brief for United States 21; see also Reply Brief for Petitioner in No. 08-1554, p. 10 (agreeing with the United States’ interpretation). This argument is unpersuasive. The United States observes that § 11706(a)(3) describes the liability of “another rail carrier over whose line or route the property is transported in the United States or from a place in the United States to a place in an adjacent foreign country when transported under a through bill of lading.” (Emphasis added.) According to the United States, “[t]hat textual limitation, when read in light of Carmack’s purpose, reflects Congress’s continued intent to restrict Carmack to the carriage of goods between places in the United States and for export to an adjacent foreign country.” Brief for United States 21. As I have already explained, however, once a domestic rail carrier first receives property for transportation within the United States, regardless of where the property itself originated, Carmack applies. Supra, at 114-117. Section 11706(a)(3) simply ensures that when a connecting carrier that neither received the property in the United States nor delivered it in the United States transports the property from the United States to either Canada or Mexico, that connecting carrier remains subject to Carmack liability during the part of the transportation that is in the United States. Further, as I explain below, see infra, at 128-131, Carmack’s purpose would be better effectuated by applying its provisions inland as the default rule. In any event, the “adjacent foreign country” provision in § 11706(a)(3) has no bearing on the rail transportation provided in these cases by Union Pacific as “receiving rail carrier,” § 11706(a), from California to four locations in the American Midwest. To this transportation, Carmack plainly applies.

 A separate version of Carmack applies to motor and other nonrail carriers within the United States. See n. 9, supra.

 Nor would my interpretation of the statute necessarily require that two different regimes apply to each shipment, given the parties’ ability to contract around Carmack as long as they follow appropriate procedures, infra, at 136-137, and, if they so choose, select COGSA terms.

 Kirby did not address the question of Carmack’s applicability to the inland leg of a multimodal international shipment traveling on a through bill of lading because that question was not presented. Brief for United States as Amicus Curiae in Norfolk Southern R. Co. v. Kirby, O. T. 2004, No. 02-1028, pp. 11-12; ante, at 93.

 Petitioner Union Pacific is a leading member of the Association of American Railroads. Train Wrecks 37, n. 214.

 The Court’s observation that nothing in the Rotterdam Rules “requires every country to mandate a different regime to govern the inland rail leg of an international through shipment” is irrelevant. Ante, at 111. The Rotterdam Rules demonstrate simply that it is common practice to have different regimes for inland and ocean transportation, so giving full effect to Carmack as the default law governing the relationship between “K” Line and Union Pacific can hardly be said to “undermine COGSA and international, container-based multimodal transport,” ante, át 108.